**In re Paul B. McCORMACK, Debtor.**

**Paul B. McCORMACK, Debtor/Movant,**

**v.**

**FEDERAL HOME LOAN MORTGAGE CORP., Acting Through Agent Chase Manhattan Mortgage Corporation, Creditor/Respondent.**

Bankruptcy No. 91–1487–JEY.

United States Bankruptcy Court,
D. New Hampshire.

Nov. 22, 1996.

Michael F. Gaffny, Amesbury, MA, for Debtor.

Julia G. Altman, Douglas A.G. Thornton, Shapiro & Kreisman, Manchester, NH, for Chase Manhattan Mortgage Corp.

Lawrence P. Sumski, Chapter 13 Trustee, Amherst, NH.·

Geraldine Karonis, U.S. Trustee, Manchester, NH.

Charles W. Gallagher, Haughey, Philpot & Laurent, Laconia, NH, for Federal Home Loan Mortgage Corp.

### MEMORANDUM OPINION

JAMES E. YACOS, Chief Judge.

This matter came before the Court on November 19, 1996, pursuant to a Procedural Order entered by this Court. This chapter 13 bankruptcy case was remanded on appeal by Order dated August 29, 1996 by the United States District Court affirming and reversing in part a prior Order of this Court entered on December 28, 1995. The August 1996 District Court Order affirmed this Court's findings under § 362(h) of the Bankruptcy Code with regard to violation of automatic stay, allowance of actual damages of $3,600, and allowance of attorney's fees and costs of $8,000 under this Court's Order. However, the District Court Order stated that "The award of punitive damages is vacated and the issue remanded to the bankruptcy court for further proceedings ..." and directed more specific findings in that regard. The original order determined that punitive damages in the amount of $25,000 should be assessed against the respondent.

The Court has considered the oral argument made by counsel at the remand hearing and has reviewed the record at some length, specifically reviewing the documents cited during the oral argument as well as all other matters of record. To clarify the record for purposes of the findings on remand the Court will withdraw its findings in paragraphs six through twelve of the Order of December 28, 1995 except to the extent that portions thereof may be reincorporated by my present more specific findings. The other findings in the December 28, 1995 Order are reaffirmed.

This chapter 13 bankruptcy case was filed on May 17, 1991 for a plan with creditors by the debtor. The relations between the debtor and Federal Home Loan Mortgage Corp., acting through agent Chase Manhattan Mortgage Corporation (hereinafter "Chase") got off to an immediate rocky start when the secured creditor, Chase, authorized its attorney to file a motion for relief from stay because certain checks tendered by the debtor were $3.42 off his regular monthly payment to Chase. This led to some ill will on the part of the debtor since he was then faced with attorney's fees, costs, and possible foreclosure for a relatively small amount of discrepancy in the payments.

In the interim Chase filed a proof of claim which asserted that the secured creditor was entitled to its attorney's fees. On December 11, 1991 Attorney Gallagher put the debtor's attorney on notice of the attorney's fees that they would be claiming.

The motion for relief from automatic stay filed by Chase on November 21, 1991 likewise claimed allowance of attorney's fees as permitted by their mortgage and promissory note documents.

The debtor's second amended chapter 13 plan was filed on January 10, 1992 and provided for payment to Chase but did not provide for any specific payment of attorney's fees claimed by Chase as part of its lien.

Chase accordingly through its attorney Charles Gallagher filed an objection on January 16, 1992 objecting to confirmation of the plan since it did not allow for full or any payment of reasonable attorney's fees which Chase claimed was included within its lien. The Court held a confirmation hearing on January 16, 1992 at which time Attorney Gallagher was present on behalf of Chase along with Attorney Charles Cleary, who was then the attorney for the debtor, as well as the chapter 13 trustee Larry Sumski. The Court heard the matter and directed Attorney Gallagher to file an itemized bill for inclusion in the file with regard to the claim of reasonable attorney's fees. That itemization was filed by Attorney Gallagher the next day, January 17, 1992.

On February 4, 1992 the debtor, acting through its attorney, filed an objection to the hourly billing statement of Attorney Gallagher raising various questions as to whether various fees were required and/or authorized and whether they were reasonable in amount. The Court reviewed this record and entered an amended order confirming the chapter 13 plan on March 9, 1992. In that Order the Court determined that Attorney Charles Gallagher would be allowed the amount of $700 on behalf of Chase under its various claims of various attorney's fees as being reasonable on behalf of Chase.[1]

Following the confirmation of the plan, as my prior findings set forth, Chase simply failed to comply with the plan and the confirming order and continued to show the amount of $1,476.58 as a negative item in the escrow account. Chase stated the amount was attributable to unpaid attorney's fees when in fact this Court had allowed only $700 as indicated above.

Suffice it to say that the Court will reaffirm to the extent that it is necessary that the question as to what Chase's reasonable attorney's fees would be was submitted to the Court by appropriate pleadings, was considered by the Court at the point of confir-

mation, and the Court determined that only $700 would be allowable as reasonable fees. This determination became final when Chase failed to file a motion to reconsider the confirming order, or failed to file any appeal from the confirming order within ten days of its entry in March of 1992.

As illustrated in the oral argument and as the record supports the debtor began questioning how Chase was handling its escrow account on this mortgage loan as early as August 1992. The debtor specifically brought to Chase's attention the fact that they were apparently trying to collect attorney's fees over what the Court had allowed.

Thereafter there ensued the barrage of correspondence back and forth that the Court referred to in its earlier findings, and it is the Court's view and finding based on a new review of this record that it was similar to two ships passing in the night, where the debtor was complaining about a number of things, including attorney's fees, and Chase was referring to a number of matters but never responded directly to the key question of what they were doing with regard to attorney's fees that had been disallowed by the Court. The numbers simply do not jibe and I believe it is credible from the documents the debtor received from Chase, and the Court finds, that the debtor would have believed and did believe that Chase was still trying to collect those monies.

In reality Chase decided on its own not to respect the confirming order and continued to show in the post-confirmation escrow items cured by virtue of the confirming order as though they were still live items due and payable and included them in the calculation of the balance owing. This device served to mask what Chase was doing with regard to trying to recover the attorney's fees. It was simply impossible to track the attorney's fee item into the escrow account, since the escrow account included not only post-confirmation transactions plus or minus (which was

---

1. The Order of March 9, 1992 is labeled an "Amended Order" but there does not appear to be any order actually entered between the hearing of January 16, 1992 and March 9, 1992. The proceeding note for January 16, 1992 indicated that chapter 13 trustee Sumski was to submit a formal order within ten days but it would appear that because of the dispute about attorney's fees the Court did not act until Mr. Gallagher's itemized bill was filed and the debtor's objection was filed.

entirely appropriate for Chase to do) but also included cured items that by virtue of law that were cured and were no longer presently due except under the terms of the plan when due under the plan in the future for payment (which Chase clearly should not have done). Therefore the Court finds it was impossible for the debtor to have any meaningful understanding of what Chase was doing with regard to the disallowed attorney's fees.

■ The Court will find that until the motion for sanctions was filed in spring of 1995, and even after that motion was filed, Chase continued to carry the unpaid disallowed excess attorney's fees as a liability owing from this debtor. The Court does not find it credible that a mortgagee who would fuss about a $3.42 disparity in a check for a mortgage payment filed during a chapter 13 would sua sponte and voluntarily back off of its position with regard to attorney's fees in the absence of the litigation that ensued. In this Court's judgment Chase knew what it was doing and simply did not want to comply with this Court's determination of what a reasonable attorney's fee would be to be included within the lien, and consistently and continually preserve that item for collection down the road when it would be appropriate following performance of the debtor's plan.

While some of the employees in Chase's employ may have considered the fees as an item that would have been wiped out after performance of the plan, the sum total of what Chase as a corporate entity did was to continue to indicate the fees as a live item. There was no disclosure by their own accounting records or to the debtor that the item was simply suspended and would not have to be paid once the plan was performed.

The exhibits show Chase responding to the debtor's inquiries with repeated assertions that attorney's fees improperly added to the escrow negative balance would be reversed or credited. However, the record shows that those corrections promised by some of Chase's employees in the correspondence did not actually occur and also that the numbers Chase used simply didn't track the numbers pertinent to the effect of the plan confirmation and were totally confusing not only to the debtor but also to some of Chase's employees as well.

Accordingly the Court will find and infer from the entire record before the Court that there was a conscious decision by Chase as a corporate entity to continue to show the cured items as live items under the negative escrow balance rather than to honor and recognize the effect of a chapter 13 and curing those items through the plan. The Court also finds that there was a conscious decision by Chase to continue to show the excess attorney's fees that were disallowed by the Court as a live item of obligation by the debtor.

■ The testimony by Chase's witness that its software at the time would not accommodate separate accounting and recording of payments coming from the trustee under the plan I find amounts to the "computer did it" defense. That defense is a nonstarter in this Court's judgment since intelligent beings still control the computer and could have altered the programming appropriately.[2] See *In re Price,* 103 B.R. 989, 992 (Bankr.N.D.Ill.1989); and *In re Stucka,* 77 B.R. 777, 783 (Bankr.C.D.Cal.1987). To paraphrase the old quote "garbage-in" adage a version here pertinent would be "contempt-of-court in" and "contempt-of-court out."

The actions by Chase in this Court's judgment deserve the imposition of punitive damages in this case. Chase acted with clear knowledge of the bankruptcy, the plan, and the confirming order and acted deliberately in a manner contrary to those requirements, knowing that it was violating federally protected rights, or at the very least acting with reckless disregard as to whether it was doing so. Cf. *In re Wagner,* 74 B.R. 898, 904 (Bankr.E.D.P.A.1987).

This case presents a unique factual situation in that we have a corporate entity acting

---

2. Although perhaps below their dignity and customary practices Chase employees were not precluded from getting a quill pen and ledger book to keep track of the effects of a chapter 13 plan in progress if indeed it was beyond the powers of mortal men and women to re-program their computer.

through many employees and agents in reaching a corporate "conscious decision" that the Court can find occurred as derived from the inferences the Court can make from the actions actually taken by the corporate entity in the circumstances. This unique situation led the Court to make some of the findings that the District Court found inconsistent. This was due to the fact that the Court noted that some of the employees who testified indicated that they were trying to respond to the complaints being made by the debtor. But the sum total of Chase's computer programming and decisions as to what went into the computer program constituted as I have found violations of the automatic stay and violations of the plan and confirming order.

■ Perhaps a less knowledgeable and less sophisticated business enterprise might not be charged with punitive damages for failing to set up appropriate computer or specialized accounting procedures with appropriate instructions to employees to avoid violations of the automatic stay in this context. Be that as it may, the Court does not believe that that concept or that defense should be available to an enterprise of the nature of Chase Manhattan Mortgage Corporation in servicing a mortgage debt that becomes involved in a chapter 13 bankruptcy reorganization proceeding. Sophisticated commercial enterprises have a clear obligation to adjust their programming and procedures and their instruction to employees to handle complex matters correctly.

Part of the complexity here stems from Chase's unilateral decision to inject cured items into the escrow account balance after confirmation of the plan. That could have been avoided, if only by manual accounting of a separate account, if there was no other way to do it on a computer program. Secured creditors have more of an obligation to debtors and borrowers who come out of confirmed reorganization proceedings in the bankruptcy court to account for the effect of plan confirmation and give a more understandable accounting of their treatment post-confirmation of a mortgage loan than was done in this case. The panoply of computer printouts presented to the debtor in this case

bring to mind the phrase "cruelty to dumb animals" in that no borrower in my judgment should have been subjected to that barrage of incomprehensible accounting printouts in response to a simple question of what has happened to the obligations cured under the plan as opposed to post-confirmation transactions. The barrage of totally meaningless and in fact misleading printouts employed by Chase in this instance was truly outrageous and egregious conduct.

Chase argues strenuously that notwithstanding all their internal accounting and forms and so forth they never threatened the debtor with collection of cured items and actually would not have attempted to collect it. The Court does not find that to be credible on the record before it. The infamous Exhibit 11 is clearly a demand and is clearly telling the debtor that these various obligations, including the disallowed and excessive attorney fee claim, were items of live liability that Chase would ultimately seek to collect. Exhibit 120 does show as the debtor argues that Chase acted upon that. Although it is true that Chase never tried to foreclose and ultimately collect the item, they were issuing year-end statements and were showing adjustments to the monthly mortgage payment amounts that all were premised on the same factual basis i.e., that Chase was considering the disallowed excess attorney's fees to still be an obligation that the debtor ultimately would have to pay.

Even assuming for purposes of argument that Chase is correct, and that ultimately they would not have attempted to collect the item, a fact which this Court does not find credible but will accept for present purposes, the record amply establishes that from the debtor's standpoint he would believe and in fact did believe that they were trying to collect that item and I think any borrower would have concluded the same.

■ Again, while it may be unique, but noting that there has to be a first time for any interpretive court decision, this Court rules here that even though there is no evidence before this Court that a specific Mr. Jones, or a Mr. Smith, or a Mrs. Jones or Mrs. Smith in Chase's employ sat in a darkened office and "with malice aforethought"

decided to violate the automatic stay punitive damages are still allowable if the sum total of the objective actions that a commercially sophisticated corporate entity took adds up to an inference and a finding that actions were taken in conscious disregard of the automatic stay or a court order.

While the Court therefore finds that there is a basis for the imposition of punitive damages in this case the Court nevertheless has to consider the factors for imposition of punitive damage, and the appropriate amount of such, in accordance with the remand by the District Court to make more specific findings. With regard to the behavior of the violator I will find for the reasons I've indicated above that the actions of Chase in this instance were outrageous and egregious to the extent that punitive damages should be allowed for the reasons indicated.

With regard to the ability to pay, there is no question that Chase is a large commercial enterprise and that it not only has the ability to pay but that if punitive damages are to be imposed for a deterrent purpose, as well as relating to the outrage of the conduct involved, they have to be more significant than might be appropriate for a smaller enterprise.

With regard to the motive factor, my findings above indicate in my judgment conscious activity by Chase as a corporate whole for its own financial benefit to not comply with the chapter 13 plan and confirming order, and thus violate the automatic stay, in the "corporate composite consciousness" concept appropriate to avoid a too easy out for large-scale commercial enterprises.

With regard to the debtor's conduct in these circumstances, the Court has withdrawn the finding that the debtor may have been playing a game or was posturing himself in the later stages to bring this litigation. On review of the record and considering the points made in the oral argument, it does appear to me that it is true that the debtor was constantly being told that corrective action was being taken and that therefore the repeated sequence of inquiry, response, and Chase's failure to take the action promised, explains the gaps in activity by the debtor in

a way that I didn't clearly understand when I made the original findings.

■ There is a remaining question that has to be addressed before an appropriate amount of punitive damage can be determined. As indicated above Chase in my judgment had to know, and did know, that it is improper to attempt to collect an obligation that has been presented to a Court— any Court for that matter and not just bankruptcy reorganization courts—once the matter has been subjected to judicial determination and has been acted upon by a final order. The same is not necessarily true, however, with regard to Chase's understanding or knowledge that they should have zeroed out the escrow account post-confirmation i.e., to start out at zero, to exclude any pre-confirmation liabilities that were cured under the plan or would be paid under the plan, and then to show the escrow account in terms of current obligations, liabilities, et cetera that would exist and would occur in the normal course post-confirmation.

That latter requirement of bankruptcy law was not, as Chase notes, spelled out in any reported decision prior to the decision of this Court in this case on December 28, 1995. This Court did touch upon the point approximately two months earlier in the *Davideit*, case, Bk No. 91–13312, (Order entered October 18, 1995), which also involved Chase. However, the *Davideit* case decision was rendered after the operative facts pertinent in the present case had already occurred.

To the extent that this Court in its prior calculation of appropriate punitive damage award took into account the failure to return the escrow to zero, at the point of plan confirmation, the Court agrees that that would not be appropriate to determine the appropriate punitive damage amount based on that conduct since that violation was not in terms of actions clearly contrary to established law. That violation in my judgment is just relevant factually to the fact that Chase's communications to the debtor were incomprehensible and did hide the fact that

they were still trying to collect the disallowed attorney's fees.[3]

The base violation involved here was the carrying of the disallowed excess attorney's fees as a live obligation by the mortgagee post-confirmation and the failure to correct that violation of the plan and confirming order notwithstanding repeated complaints by the debtor in that regard.

Another factor that might be considered in an appropriate case for imposition of punitive damages would be whether the record established a pattern of such conduct by the mortgagee in other bankruptcy cases that involved confirmed plans that cured pre-bankruptcy liabilities. On reflection I conclude that this record does not establish the basis for any such conclusion which was inferred indirectly by my original findings. Those original findings have been withdrawn as indicated. There is no showing in record that Chase has embarked upon or is continuing a pattern of such conduct in other cases. To the extent that that consideration was relevant to my determination of the punitive damage amount the last time, the Court no longer has that finding in this record and will not act on that basis. The Court's judgment with regard to the imposition of the appropriate amount of punitive damages in this case at this time is based upon only the foregoing specific findings together with the findings that I have not withdrawn from the December 1995 order.

In accordance with the findings and conclusions reached by this Court regarding the remanded punitive damages question, a separate order will be entered determining that the amount of $10,000 in punitive damages is appropriate for the egregious conduct of Chase involved in this case as summarized above.

---

**3.** As noted above, even if Chase didn't zero-out the escrow account generally they could have separately accounted for cured items or otherwise explained to the debtor how they were treating plan cured items in a fashion that was not only understandable but would have clearly committed Chase to no future attempt to collect the items once the plan was performed.