**In re Francis Michael LATANOWICH,
Debtor.**

**Bankruptcy No. 95–18280–CJK.**

United States Bankruptcy Court,
D. Massachusetts.

April 16, 1997.

Eric Bradford, Boston, MA, for United States Trustee.

Mark Polebaum, Boston, MA, for Sears, Roebuck & Co.

Harold Murphy, for Debtor.

Susan Poswistilo, Boston, MA, for United States Attorney.

Thomas Bean, Boston, MA, for Attorney General.

## MEMORANDUM OF DECISION ON SANCTIONS FOR VIOLATION OF DISCHARGE BY SEARS, ROEBUCK & CO.

CAROL J. KENNER, Chief Judge.

The Debtor, Francis M. Latanowich, moved to reopen this case to seek relief from, among other debts, one to Sears, Roebuck & Co. that he had listed in his schedules and that appeared to have been discharged. When it became clear that Sears had prevailed upon the Debtor, acting *pro se*, to reaffirm his debt but then had refrained from filing the agreement and had nonetheless

enforced it against the Debtor, the Court issued an order to show cause why Sears should not be sanctioned for violation of the Debtor's discharge. At a hearing on the order, the Court further learned that Sears had done this deliberately, as a matter of company policy, in blatant disregard of the discharge provisions of the Bankruptcy Code. Having considered Sears's response to my order and the United States Trustee's memorandum in support of sanctions, and for the reasons set forth below, the Court now finds Sears in contempt of the discharge order and will order Sears to pay compensatory damages and punitive damages to the Debtor and will enter additional orders as outlined below.

### FACTS AND PROCEDURAL HISTORY

The Debtor, Francis M. Latanowich, acting *pro se,* filed his petition under Chapter 7 of the Bankruptcy Code on December 7, 1995. In his bankruptcy schedules, he listed total assets of only $375 and unsecured debts totaling $12,805.20, all in the nature of consumer credit. This sum included an unsecured, nonpriority debt to Sears in the listed amount of $1,073.64 for consumer purchases.[1] In his schedule of current income and expenditures, he disclosed that he was married and unemployed, that he received total monthly income of only $500, consisting entirely of Social Security disability benefits, and that he had monthly expenditures of $1,449. The Chapter 7 Trustee in the case reported that the estate had no assets to distribute.

On April 1, 1996, with no objection to discharge or to the dischargeability of any debt having been filed, the Court entered a discharge order in favor of the Debtor under 11 U.S.C. § 727(b). Consistent with 11 U.S.C. § 524(a)(2), the discharge order provided, in relevant part:

1. The above-named debtor is released from all dischargeable debts. . . .

3. All creditors whose debts are discharged by this order and all creditors whose judgments are declared null and void by paragraph 2 above are enjoined from instituting or continuing any action or employing any process or engaging in

any act to collect such debts as personal liabilities of the above-named debtor.

The clerk served the discharge order on all creditors, including Sears, who does not deny having received it. No appeal was taken from the order. The case was closed on April 3, 1996.

Only one reaffirmation agreement was filed in the case before it was closed: an agreement that the Debtor had entered into with FDS National Bank, reaffirming a debt in the amount of $1,177.67. The agreement was not accompanied by an affidavit of debtor's counsel, so the Court set the matter for hearing on February 22, 1996. However, by a statement filed in the case on February 9, 1996, the Debtor rescinded the agreement, and consequently no hearing was ever held. Neither the Debtor nor Sears ever filed a reaffirmation agreement as to the Sears debt.

On November, 14, 1996, the Debtor, again acting *pro se,* filed a motion (in the form of a letter) to reopen his case. In his motion, he states that when he filed his bankruptcy petition in December, 1995,

I took advice from a lawyer friend and he told me to keep some of my debts so I could start getting my credit back. I receive 518 dollars a month on social security for a disability I have. I have tried to meet the payment every month but it is keeping food off the table for my kids. I would like to know if you could reopen my case so I could get rid of all my debt forever.

Below, he listed four debts from which he sought relief, totaling approximately $12,000, including the previously-listed debt to Sears, which now he quantified at $1,330.58.

### First Hearing: Motion to Reopen

The court held a hearing on the motion on December 17, 1996. At the outset, only the Debtor was in attendance. He indicated that the debt to Sears from which he was seeking relief was the same debt to Sears that he had listed in his schedule of unsecured creditors; and he further stated his belief that the debt had not been discharged. When asked why

1. Schedule F.

he believed it had not been discharged, he explained that, in order to keep certain merchandise that Sears had threatened to repossess, he had entered into a reaffirmation agreement with Sears. He also indicated that on the advice of counsel—a friend who had given him free advice—he had not listed the three other debts from which he was seeking relief; he believed this would exclude the debts from discharge and thereby help him maintain or reestablish his credit.

At this point, noting that no reaffirmation agreement with Sears had been filed in the case, the Court called attorneys Eric Bradford, who is counsel for the United States Trustee, and William Harris into the hearing. Harris was then in the courtroom in connection with a different matter; his firm, Schreiber & Associates, P.C., often represented Sears on consumer bankruptcy matters in this court. He indicated to the Court he "would certainly take an interest in what's going on here."

The Debtor went on to explain that, in soliciting his agreement to reaffirm the debt, Sears had indicated that the value of the items it was seeking to repossess was approximately $470.00. One of these items was a television set, which he wanted to keep for his children.

The Court then, on the record, ordered Sears to show cause why sanctions should not be imposed on it for inviting the Debtor to pay a debt that had been discharged in his Chapter 7 case. The Court also allowed the Debtor's motion to reopen and ordered the Debtor to pay nothing further to Sears until further order of the Court.

### Second Hearing: Order to Show Cause

On January 29, 1997, the Court held a hearing on the order to show cause, at which the Debtor testified under direct examination by the United States Trustee and cross-examination by Sears. By virtue of this testimony and of certain admissions by Sears, together with the information contained in an accounting that Sears later supplied, the following facts were established and appear to be undisputed.

When the Debtor filed his bankruptcy petition, he listed Sears on the matrix in the case. The Bankruptcy Court notified Sears of the filing,[2] and Sears received that notice no later than January 22, 1996. On that date, Sears initiated contact with the Debtor by mailing him a letter, accompanied by a proposed reaffirmation agreement.

The letter informed the Debtor that Sears had received notice of his bankruptcy filing and that his account balance was $1,161.34.[3] It also informed him that Sears had a security interest in the merchandise represented in the account balance, including an automobile battery and a television set. It set forth the dates of purchase for these items, their purchase prices, and their (then) current values as follows:

| Item | Date of Purchase | Purchase Price | Current Value |
|------|------------------|----------------|---------------|
| Battery | 7/17/95 | $ 75.33 | $ 75.33 |
| Television | 6/1/95 | $503.87 | $403.10 |

The letter then asked the Debtor to inform Sears of his intention as to his account. It listed three options:

A. Sign Reaffirmation Agreement as to account balance, to be paid in monthly installments.

B. Redeem merchandise, by making lump sum cash payment only.

C. Return merchandise to Sears.

The letter then stated that "should you elect to reaffirm for the account balance, a line of credit in the amount of $1,161.00 will be granted immediately to assist you in the establishment of a favorable credit history."

The accompanying proposed reaffirmation agreement was captioned *"Reaffirmation Agreement,* Secured" and stated, in relevant part:

Debtor wishes to either retain the property securing the account balance, to settle creditor's claims of nondischargeability under # 523, and/or to continue to use the Sears/Charge Account by reaffirming said debt and security agreement.

---

**2.** The docket in this case indicates that the notice to creditors was mailed on December 22, 1995.

**3.** The discrepancy between this amount and the amount listed by the Debtor has not been explained but also is not at issue.

Debtor promises, reassumes and agrees to be bound by all the terms and conditions as set forth in the original security agreement, as amended from time to time, with Creditor including applicable finance charges. Debtor agrees to pay the sum of $1,161.34 in payments of $28.00 per month commencing 03/13/96 and on the same date of each and every succeeding month until said sum is fully paid. Creditor agrees to immediately reinstate a line of credit of $1,161.00 to the account.

**THIS AGREEMENT IS NOT RE-QUIRED UNDER THE BANKRUPTCY CODE, ANY NON–BANKRUPTCY LAW, OR ANY AGREEMENT THAT IS NOT IN ACCORDANCE WITH THE PROVISION OF THE SECTION 524(C). THIS AGREEMENT MAY BE RE-SCINDED AT ANY TIME PRIOR TO DISCHARGE OR WITHIN SIXTY (60) DAYS AFTER THIS AGREEMENT IS FILED WITH THE COURT, WHICH-EVER OCCURS LATER, BY GIVING WRITTEN NOTICE OF RESCISSION TO CREDITOR AT THE FOLLOWING ADDRESS:**

### Sears

### 45 Congress Street

### Salem, MA 01970

The form also included a "Declaration by Attorney for Debtor" containing the representations required by 11 U.S.C. § 524(c)(3) and a line for counsel's signature. And it included a proposed "Order Approving Reaffirmation Agreement," which expressly noted that it was "only required if the above Debtor(s) are not represented by an Attorney." The proposed order simply stated: "The above Reaffirmation Agreement having come before this Court and the requirements of 11 U.S.C. Sec. 524 having been satisfied, BE IT ORDERED that the above Reaffirmation Agreement is hereby approved."

On January 29, 1996, after receiving the letter, the Debtor called a representative of Sears, who informed the Debtor that unless he agreed to pay the full balance due, he would have to return the merchandise that was subject to Sears's security interest.

When the Debtor indicated that he needed additional credit to purchase clothing for his children, the representative stated that if the Debtor did agree to reaffirm the debt, Sears would increase his credit limit to $200 above the amount then due. Believing he had no choice if he wanted to retain the merchandise, the Debtor indicated that he would sign the agreement. He also asked the representative whether Sears would notify the Court of the agreement. The representative answered, "All you have to do is sign the paper. We'll take care of the rest."

On January 29, 1996, the Debtor signed the reaffirmation agreement and returned it to Sears. Sears received the agreement but did not file it in the Debtor's bankruptcy case. This was not an oversight but a matter of policy on the part of Sears. Sears did not inform the Debtor that the agreement would not be binding unless submitted to the court. Nor did it inform him that it did not and would not file the agreement in the Bankruptcy Court.

After the Debtor called in February, 1996 to complain that his credit had not been restored, Sears did restore the Debtor's credit, though not in the full amount that had been promised. From March through November, 1996, the Debtor used this credit to purchase clothing, tools, and automotive services, all totaling $338.91. From March, 1996 through January of 1997, Sears billed the Debtor on a monthly basis, not only for the new debt but also for the prepetition debt, including postpetition interest thereon, which in itself averaged $21.50 per month during this period. On March 5, 1996, the Debtor began making monthly payments on the balance due, and he continued making these payments through November, 1996. His payments during this period totaled $375.00. Together with the other payments he was making during this period, the Debtor's payments to Sears were a burden on his family. During this period, the Debtor's payments exceeded his new purchases by $40.00, but his balance in November, 1996 exceeded the balance that according to Sears was due at the time of the bankruptcy filing

by $160.00.[4] Aside from billing him monthly for the prepetition debt, Sears had no communication with the Debtor during this time and never bothered or harassed him about payments.

Sears produced no witnesses or evidence of its own at the hearing. However, through its attorney, Mr. Harris, it explained that it did not file the reaffirmation agreement because, in another case in this district, Judge Hillman had entered an order of civil contempt under which Sears would incur sanctions if it filed further reaffirmation agreements containing certain prohibited language. See *In re Iappini*, 192 B.R. 8 (Bankr.D.Mass.1995) (Hillman, J.).[5] However, Harris stated, Sears did not learn of the *Iappini* order until after it had mailed to the Debtor the proposed reaffirmation agreement described above, which did contain the prohibited language. Once the Debtor executed the agreement and returned it to Sears, Harris explained, Sears could not file it without incurring sanctions, so it decided not to file the agreement.

This explanation is deficient in two respects. First, it is not supported with evidence as to the timing of the events that created this alleged predicament. The *Iappini* order was issued on November 28, 1995. The Court thinks it highly unlikely that Sears did not receive notice of the order until after January 22, 1996, the date of its mailing to the Debtor. Moreover, the evidence shows that, even after dates by which Sears concedes that it had knowledge of the *Iappini* order and had instituted a policy of not filing reaffirmation agreements, Sears continued for many months to solicit such agreements from debtors in this district. I therefore disbelieve Mr. Harris's explanation that Sears did not know of *Iappini* when it solicited this agreement from the Debtor.

Second, even if it were true, Mr. Harris's explanation would fail to explain why Sears did not avail itself of other measures by which Sears could, without filing the reaffirmation agreement, avoid violating the discharge injunction. After Sears received the Debtor's signed reaffirmation agreement and decided not to file it, Sears could have (1) informed the Debtor that the agreement had not been (and would not be) filed and therefore was not effective, binding, or enforceable,[6] (2) discontinued billing on the account, and (3) refunded payments that the Debtor made while under the belief that Sears had filed the agreement and that it was binding. Sears did none of these things and did not explain why not. These remedies were obvious and simple enough, so I find no merit to Sears's explanation that it had no option other than to do what it did.

At the close of the hearing, the Court took the matter under advisement and shortly thereafter issued two procedural orders. The first afforded interested parties an op-

---

4. The accounting summarized in this paragraph is derived from documents, comprising a computerized accounting, that Sears filed in this case. Sears produced the accounting in response to an order, made by the Court on the record at the January 29 hearing, to produce an accounting of the payments that the Debtor made on his account, together with any invoices and other documents that Sears may have in relation to this account. (Sears was ordered to file these documents in court by February 5, 1997, but, without excuse, did not file them until February 27, 1997.)

5. In *Iappini*, the form of reaffirmation used by Sears stated, in relevant part, "debtor wishes either to retain the property securing the account balance, to settle creditor's claim of nondischargeability under # 523, and/or to continue to use the Sears Charge Account by reaffirming said debt and security agreement." *Iappini*, 192 B.R. at 8. Judge Hillman stated that "it appears to the Court that the inclusion of the quoted language regarding 'creditor's claim of nondischargeability under # 523,' where no such claim has been made in this case, is designed to entice the Debtors to reaffirm an obligation and the inclusion is without good cause and hence is made in bad faith." *Id.* at 9. Therefore, he ordered that "All further similar agreements which come before the Court containing the language referring to 11 U.S.C. § 523, when no adversary proceeding has been filed [for a declaration that a debt is excepted from discharge under that section] will be considered a violation of Fed.R.Bankr.P. 9011 and/or contempt of this Court and appropriate sanctions will be considered upon notice and an opportunity to be heard." *Id.*

6. Until the discharge entered, fully two months after the Debtor returned the signed reaffirmation agreement to Sears, Sears could have solicited a new, replacement agreement from the Debtor, using a form that satisfied *Iappini*.

portunity to file briefs in connection with the order to show cause. Sears filed a brief in defense of its actions, which it has now withdrawn; and the United States Trustee has filed a brief in support of sanctions.

The second procedural order required Sears to file, on or before February 28, 1997, a list "of every case in which Sears solicited a reaffirmation agreement from a debtor in this Court, obtained the debtor's signature on that agreement and then refrained from filing that agreement with the Court.... The time period covered is January 1, 1995 through January 29, 1997." On February 28, 1997, someone—presumably Sears, but that is not clear—filed a document (# 23 on the docket in this case) that consists simply of several lists of debtors, together with each debtor's case number, filing date, and account number. The document does not identify itself as the response to the January 30 procedural order, does not indicate who filed it, and is not accompanied by an affidavit or any other statement as to who prepared the list and what it purports to be.

Therefore, on March 3, 1997, the Court further ordered that, on or before March 14, 1997, Sears was to file a document, entitled "Response of Sears to Procedural Orders of January 30 and March 3, 1997," and signed by counsel, supplying the required information, together with the affidavit of the person who prepared it, which explained what the list purported to be and indicated whether the list included all cases from the District of Massachusetts that satisfy the requirements of these orders. The affidavit was required to indicate (1) whether each of the cases identified was one in which, during the applicable period, Sears solicited a reaffirmation agreement from a debtor in a case in the United States Bankruptcy Court for the District of Massachusetts, obtained the debtor's signature on that agreement, and then refrained from filing that agreement with the Court; and (2) whether the list included all the cases conforming to these requirements.

Sears filed the "Response" on March 14, 1997, together with the affidavit of George Fitzgerald, whose position with Sears is "Recovery Manager" and whose responsibility is to supervise the Recovery Department of the Sears Boston Regional Credit Card Operations Center. With his affidavit, Fitzgerald attached a list of approximately 2733 bankruptcy cases. Fitzgerald averred that the list contains every case in the U.S. Bankruptcy Court for the District of Massachusetts in which, from January 1, 1995, through January 29, 1997, Sears obtained a postpetition agreement from the debtor entitled "Reaffirmation Agreement," obtained the Debtor's signature on that agreement, and then did not file the agreement with the Bankruptcy Court. The list includes many cases that date from the early months of 1995, but most are 1996 cases in which the reaffirmation agreement must have been obtained after Sears obtained the agreement in this case and after Sears learned about the Judge Hillman's order in *Iappini*.

On April 9, 1997, Sears withdrew the memorandum of law it had filed in response to the order to show cause and informed the Court that "the company no longer intends to contest the Court's order to show cause." (Motion to Withdraw Memorandum of Law in Response to Court's Order to Show Cause, ¶ 2.)

### *JURISDICTION*

The purpose of this proceeding is to determine whether the actions taken by Sears constituted violations of the discharge order and, if so, to compensate the Debtor for his damages, to ensure Sears's future compliance with the discharge order, and, as appropriate, to enforce the discharge by entry of punitive damages. The bankruptcy discharge is central to the relief afforded by the Bankruptcy Code. A proceeding to enforce the discharge is a core proceeding. 28 U.S.C. § 157(b)(2)(O ) ("Core proceedings include ... proceedings affecting ... the adjustment of the debtor-creditor ... relationship.); *In re Schatz*, 122 B.R. 327 (N.D.Ill. 1990) (proceeding to enforce discharge order and adjudicate a violation thereof falls within bankruptcy court's core jurisdiction); *In re Thomas*, 184 B.R. 237, 240 (Bankr.M.D.N.C. 1995) (proceeding for damages and attorney's fees for violation of discharge injunction is core proceeding). Therefore, this Court may hear and determine this matter and enter an appropriate order. 28 U.S.C. § 157(b)(1)

("Bankruptcy judges may hear and determine ... all core proceedings arising under title 11 ... and may enter appropriate orders and judgments"); *In re Monarch Capital Corp.*, 173 B.R. 31, 35–38 (D.Mass.1994) (contempt proceeding to enforce order resolving a core proceeding is itself a core proceeding and is reviewed by way of direct appeal under 28 U.S.C. § 158, not by *de novo* review under 28 U.S.C. § 157(c)(1) and F.R.Bankr.P. 9033), *aff'd Monarch Life Ins. Co v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995).

The Court's authority to enforce the discharge order is set forth in 11 U.S.C. § 105(a).[7] The Code does not provide an express remedy that is specific to the discharge. Section 105(a) clearly provides the court with power to impose remedial sanctions and to ensure prospective compliance with the discharge injunction. By its grant of authority to take any action necessary to enforce a court order, this Court also reads that section as authorizing punitive sanctions, which are simply another mechanism by which the court enforces its orders. *Brown v. Ramsay (In re Ragar )*, 3 F.3d 1174, 1179 (8th Cir.1993) ("An order of criminal contempt, no less than one of civil contempt, is necessary or appropriate to enforce the order for whose violation it is imposed."). Punitive sanctions, though imposed as punishment after the fact, nonetheless enforce court orders by their very availability and the threat of their imposition for violations of such orders.

To the extent that the Court's authority herein rests solely on § 105(a), this matter may be viewed as a contempt proceeding, partly civil [8] and, to the extent it involves punitive damages, partly criminal.[9] The First Circuit Court of Appeals has held that the bankruptcy courts are vested with contempt powers. *Eck v. Dodge Chemical Company (In re Power Recovery Systems, Inc.)*, 950 F.2d 798, 802 (1st Cir.1991). The *Power Recovery* case involved civil contempt, but the language by which the court defined the bankruptcy court's authority—"It is well settled that the bankruptcy courts are vested with contempt powers"—embraced the contempt power in general and was not limited to civil contempt. Moreover, despite earlier cases to the contrary,[10] the weight of authority from other circuits now recognizes that the bankruptcy court has authority to enforce its own orders in core proceedings by the power of both civil and criminal contempt.[11]

**7.** Section 105(a) provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

**8.** "Sanctions in a civil contempt proceeding are employed to coerce the defendant into compliance with the court's order or, where appropriate, to compensate the harmed party for losses sustained. The sanctions are not punitive but purely remedial." *In re Power Recovery Systems, Inc.*, 950 F.2d 798, 802 (1st Cir.1991).

**9.** "Criminal contempt sanctions ... are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." *In re Power Recovery Systems, Inc.*, 950 F.2d at 802 n. 18.

**10.** See *In re Sequoia Auto Brokers, Ltd.*, 827 F.2d 1281 (9th Cir.1987) (for lack of statutory authority, the bankruptcy court has no power of civil contempt), now superseded by *Caldwell v. Unified Capital Corp. (Rainbow Magazine, Inc.)*, 77 F.3d 278, 283–285 (9th Cir.1996) (bankruptcy court had inherent authority to enter punitive sanction for bad faith filing); and *Matter of Hipp, Inc.*, 895 F.2d 1503 (5th Cir.1990) (bankruptcy court lacks power of criminal contempt, at least as to contempts not committed in their presence).

**11.** *Caldwell v. Unified Capital Corp. (Rainbow Magazine, Inc.)*, 77 F.3d 278, 283–285 (9th Cir. 1996) (bankruptcy court had inherent authority to enter punitive sanction for bad faith filing); *Brown v. Ramsay (In re Ragar )*, 3 F.3d 1174, 1177–1180 (8th Cir.1993) (bankruptcy court has power of criminal contempt, at least when acting subject to review as provided in F.R.Bankr.P. 9020(c)); *Mountain America Credit Union v. Skinner (In re Skinner )*, 917 F.2d 444, 447 (10th Cir.1990) (section 105(a) empowers bankruptcy courts to enter civil contempt orders, and the delegation of such power to the bankruptcy court does not violate the constitutional separation of powers); *Burd v. Walters (In re Walters )*, 868 F.2d 665 (4th Cir.1989) (same).

## VIOLATION OF DISCHARGE ORDER

In a case under Chapter 7 of the Bankruptcy Code, unless a party in interest timely objects, "the court shall grant the debtor a discharge." 11 U.S.C. § 727(a). Subject to the exceptions enumerated in § 523(a) of the Bankruptcy Code, "a discharge under [§ 727(a)] discharges the debtor from all debts that arose before the date of the order for relief under [Chapter 7]." 11 U.S.C. § 727(b).[12] As in most Chapter 7 cases, the date of the order for relief in this case is the date on which the Debtor filed the petition commencing his case. 11 U.S.C. § 301 ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter."). No objection having been filed in this case, the Court did grant the Debtor a discharge, and the discharge applied to the Debtor's prepetition debt to Sears. Sears does not dispute this.

■ A discharge order operates as, among other things, an injunction against the commencement or continuation of any act to collect, recover, or offset any debt to which it applies—in this case, any prepetition debt—as a personal liability of the debtor, even if discharge of the debt was waived. 11 U.S.C. § 524(a)(2).[13] Lest there be any doubt or confusion about its import, the discharge order that the Court entered in this case and sent to all creditors, including Sears, expressly provided:

All creditors whose debts are discharged by this order ... are enjoined from instituting or continuing any action or employ-ing any process or engaging in any act to collect such debts as personal liabilities of the above-named debtor.

The purpose of the permanent injunction set forth at § 524(a)(2) and reiterated in the discharge order is to effectuate one of the primary purposes of the Bankruptcy Code: to afford the debtor a financial "fresh start." *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir.1992) and authorities cited. Accordingly, Congress designed and intended the permanent injunction "to give complete effect to the discharge," "to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts," and "to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it." S.Rep. No. 989, 95th Cong., 2d Sess. 80–81 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5866; H.R.Rep. No. 595, 95th Cong., 1st Sess. 365–366 (1977).

■ The Code permits debtors to reaffirm debts that would otherwise be discharged, but only under conditions, set forth in § 524(c), whose purpose is "to 'protect debtors from compromising their fresh start by making unwise agreements to repay dischargeable debts' ... [and] to avoid 'the danger that creditors may coerce debtors into undesirable reaffirmation agreements.' " *In re Hovestadt*, 193 B.R. 382, 386 (Bankr. D.Mass.1996), quoting *In re Noble*, 182 B.R. 854, 856 (Bankr.W.D.Wash.1995), in turn quoting *In re Getzoff*, 180 B.R. 572, 574 (9th Cir. BAP 1995). Section 524(c) of the Bankruptcy Code[14] defines a reaffirmation agree-

---

12. Section 727(b) provides:

Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

11 U.S.C. § 727(b).

13. Section 524(a)(2) provides:

(a) A discharge in a case under this title—
(2) operates as an injunction against the commencement or continuation of an action,

the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

14. Section 524(c) provides:

An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—
(1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
(2)(A) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any

ment as "an agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title." 11 U.S.C. § 524(c). In its initial opposition to the Order to Show Cause, Sears initially denied that the agreement at issue was a reaffirmation agreement. Sears has now withdrawn its opposition and no longer disputes what has always been clear: that the agreement at issue was a reaffirmation agreement within the meaning of this definition and was subject to the requirements and protections of § 524(c).

 Section 524(c) provides that a reaffirmation agreement is enforceable only if certain requirements are met. Two are pertinent here: the agreement must be filed with the bankruptcy court, § 524(c)(3); and, in instances where the debtor was not represented by counsel in the course of negotiating the agreement, the court must approve the agreement as (i) not imposing an undue hardship on the debtor or a dependent of the debtor and (ii) in the best interest of the debtor. § 524(c)(6)(A). The first makes the second possible, and the second protects debtors from reaffirming debts improvidently—because they do not understand their rights and options, because they fall victim to overreaching creditors, or for whatever reason—by interposing the independent review and judgment of the court. These requirements are mandatory; and, as they exist to protect a debtor from his or her own bad judgment, the debtor cannot waive them.

For several reasons, some of which were known to Sears, the Debtor's reaffirmation agreement needed the benefit of this review mechanism. The Debtor's first purpose in entering into this agreement was to avoid losing the collateral that secured Sears's claim, but the Debtor probably did not understand that under 11 U.S.C. § 722, he could redeem these items by paying Sears the liquidation value of the collateral. By Sears's own numbers, the value totaled only $478.43, less than half the amount of the debt he was reaffirming (and their real value was probably substantially lower). Second, the Debtor reaffirmed the Sears debt for the additional purpose of preserving his credit with Sears, but he got very little credit for the price. In exchange for his agreeing to pay a debt of approximately $1,100 plus interest, Sears agreed to give the Debtor a line of credit of only $200 over the amount then owing. Third, and not least, the Debtor's schedule of income and expenses showed no excess income with which to pay the debt he was reaffirming. Unquestionably, the Court would have denied approval of this agreement.

But the point here is not that the agreement would not have been approved. Rather, it is that Sears manipulated the process to assure that no review would ever occur.

time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim; and

(B) such agreement contains a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection;

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that—

(A) such agreement represents a fully informed and voluntary agreement by the debtor;

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

(C) the attorney fully advised the debtor of the legal effect and consequences of—

(i) an agreement of the kind specified in this subsection; and

(ii) any default under such an agreement;

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

(5) the provisions of subsection (d) of this section have been complied with; and

(6)(A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as—

(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and

(ii) in the best interest of the debtor.

(B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.

11 U.S.C. § 524(c).

It obtained a signed reaffirmation agreement from the Debtor and led him to believe that it would file the agreement but, quite deliberately, never did. Consequently, the agreement never came to the Court's attention and never was reviewed or approved.

For lack of filing and court approval, the agreement is void and never became effective or enforceable. Upon entry of the discharge order, the Debtor's prepetition obligation to Sears was discharged, and Sears was thereby enjoined from engaging in any act to collect it as a personal liability of the Debtor. Nonetheless, Sears did engage in acts to collect it as a personal liability of the Debtor. Commencing during the month before the discharge entered and continuing through eight months after it entered, Sears billed the Debtor, assessed interest, and accepted payments on the prepetition debt, all on a monthly basis. To the extent that these acts occurred after entry of the discharge, they were violations of the discharge order.[15]

Sears took these actions deliberately, with full knowledge that the agreement had not been filed and, consequently, that the debt was subject to the discharge injunction. Through Mr. Harris, Sears admitted that its failure to file the agreement was not inadvertent but deliberate: to avoid violating the *Iappini* injunction and thus exposing itself to sanctions.[16] Consequently, when Sears resumed billing on the Debtor's prepetition debt, it did so with knowledge that the agreement had not been filed. By virtue of its extensive experience in this area of bankruptcy law, Sears understood the import of this fact: that the agreement was ineffective, and that upon entry of the discharge, Sears was enjoined from taking any act whatsoever to collect its prepetition debt. This was deliberate disregard of a known law.

Moreover, Sears's action in this case was no isolated incident. Sears admits that from January 1, 1995, through January 29, 1997, in over 2,700 cases in this district alone, it solicited and obtained a reaffirmation agreement that it then failed to file. That fact underscores Sears's willful and intentional flouting of the Bankruptcy Code. *In re McCormack*, 203 B.R. 521 (Bankr.D.N.H. 1996) (without evidence that any specific individual agent of corporate contemnor decided to violate the automatic stay, the court nonetheless found that "the sum total of the objective actions that a commercially sophisticated corporate entity took adds up to an inference and a finding that actions were taken in conscious disregard of the automatic stay or a court order").

When a creditor solicits a reaffirmation agreement from a debtor, especially one acting without benefit of counsel, the debtor's mere submission of the agreement to the creditor is often enough to mislead the debtor into believing that he or she is legally obligated to honor it, and Sears surely appreciated this. Mr. Latanowich repaid his debt under such a false belief, which Sears itself had intentionally created. "No transaction that leaves a debtor ... believing that he or she is obligated to pay any part of a discharged debt can be characterized as voluntary repayment within the meaning of section 524(f)." *In re Bowling*, 116 B.R. 659, 664 (Bankr.S.D.Ind.1990). Rather, the use of such a transaction to collect a discharged debt is an act in violation of the permanent injunction. Having obtained the agreement and decided not to file it, Sears became obligated to inform the Debtor that the agreement was ineffective and that he was under no obligation to pay. No such measures were employed in this case; quite to the contrary, Sears resumed billing on the debt. The fact that Sears so often created and faced this issue yet did not routinely employ corrective measures leads the Court

15. The Court also notes that the acts undertaken by Sears *before* entry of the discharge were willful violations of the automatic stay, 11 U.S.C. § 362(a)(1) (prohibiting any action against the debtor to recover a claim against the debtor that arose before the commencement of the case), for which Sears would be subject to actual damages, including costs and attorneys' fees, and punitive damages. 11 U.S.C. § 362(h). The Court in this case does not base its award of sanctions on the violation of the stay only because the order to show cause did not specifically cite the automatic stay.

16. This was half the truth. The other half, I find, was that Sears wanted the benefits of a reaffirmation agreement without having to conform to *Iappini* and § 524(c).

to conclude that Sears's disregard for the law and for the rights of the Debtor in this case was also systematic, a matter of company policy.

## RELIEF, SANCTIONS, AND ENFORCEMENT MEASURES

### a. Declaratory Relief and Compensatory Damages

█ The Debtor is entitled to a declaration that his prepetition debt to Sears is discharged, that the reaffirmation agreement is void and never became effective, that Sears remains enjoined from taking any action whatsoever to recover its claim as a personal liability of the Debtor, and that the balance owing on his Sears account as of November 13, 1996, was zero.

█ The Debtor is also entitled to compensation for his postpetition payments of principal and interest on the prepetition debt, a total of $375. Sears did not indicate how it had applied the postpetition payments. The Court will allocate the postpetition payments entirely to prepetition debt, making it entirely refundable. However, against this amount, Sears is entitled to a credit for the cost of and finance charges on the merchandise he financed postpetition through November 13, 1996 (the last date covered by the financial history adduced by Sears). The Debtor financed new merchandise in the total amount of $338.91. Sears's accounting does not distinguish interest assessed on postpetition purchases from interest assessed on prepetition; nor has Sears produced any evidence of the applicable interest rate, this despite an order to produce all relevant documents. Therefore, though Sears would be entitled to a credit for interest due on the postpetition purchases, I quantify that amount at zero. (As the Debtor made regular postpetition payments that exceeded postpetition purchases, the amount is surely *de minimis*.) The net balance due the Debtor under this paragraph is $36.09, plus interest at the federal judgment rate from November 14, 1996, the date on which he filed his motion to reopen.

█ The Debtor is also entitled to a reasonable sum, which I fix at $200, for his time and effort and for the travel and other incidental expenses he incurred in finally securing the benefit of his discharge. He would also be entitled to reasonable attorney's fees, but, fortunately for Sears, he was not represented by counsel in this matter. In sum, Sears shall pay the Debtor compensatory damages of $236.09, and it shall do so not by setoff and not in the form of an account credit or of a Sears gift certificate, but by cash.

### b. Punitive Damages

The consequential damages in this case do not begin to reflect the magnitude of Sears's offense against Mr. Latanowich and against the bankruptcy law. Sears here made a conscious decision to disregard the clear requirements of the law because it was more expeditious and profitable to do so.[17] Its conduct toward the Debtor was predatory: Sears preyed on the Debtor when he was financially most vulnerable and powerless; and in doing so it deprived him of the fresh start that Congress intended that he should have. Sears's disregard for the plain requirements of the discharge order and of § 524(c) was contemptuous, as was its response (in this case) to *Iappini*, which was simply not to file—but still enforce—an agreement that *Iappini* prohibited. Bankruptcy courts cannot tolerate such calculated and systematic disregard for the fundamental protections of bankruptcy law. This is especially true when the creditor is a major retailer, with claims in many Chapter 7 cases, that routinely solicits and, as in approximately 2700 cases in this district alone, obtains reaffirmation agreements from debtors. *In re McCormack*, 203 B.R. 521, 525–526 (Bankr.D.N.H.1996) (punitive damages are allowable "if the sum total of the objective actions that a commercially sophisticated corporate entity took adds up to ... a finding that actions were taken in conscious disregard of ... a court order").

---

**17.** The findings of fact on which the award of punitive damages have been established by proof beyond a reasonable doubt. *In re Power Recov-* *ery Systems, Inc.*, 950 F.2d at 802 n. 18 (criminal contempt sanctions require proof beyond a reasonable doubt).

In this case, the consequential damages do little more than dispossess the contemnor of its ill-gotten gains, which leaves it in no worse a position than if it had not violated the law at all. This gives Sears no incentive to discontinue its unlawful practice. In the form of punitive damages, the Court will supply this incentive by making it significantly more costly for Sears to do business by illegal methods than by legal ones. *In re McCormack*, 203 B.R. at 525–526, 527 (in quantifying punitive damages, court may consider whether the record established a pattern of such conduct in other bankruptcy cases; and "if punitive damages are to be imposed [against a large commercial enterprise] for a deterrent purpose, as well relating to the outrage of the conduct involved, they have to be more significant than might be appropriate for a smaller enterprise"). However, the Court will refrain from issuing an order of punitive damages today, since doing so might arguably impair the government's authority to impose criminal penalties. As soon as that issue is clarified, the Court will sanction Sears in an amount payable to Mr. Latanowich.

As a further punitive sanction and to insure that Sears does not use a threat of repossession against the Debtor as leverage to collect its prepetition claim, the Court will also permanently enjoin Sears from taking any action to enforce its alleged security interest in items the Debtor acquired prepetition.

### c. *Other Measures*

The Court has issued an order to show cause why compensatory and punitive damages should not enter in each of the 2733 other cases in which Sears has admitted that it obtained a reaffirmation from the debtor that it then failed to file.