David CONLEY, et al., Plaintiffs,

v.

SEARS, ROEBUCK AND CO., Western Auto Supply Company, and John Does 1–10, Defendants.

No. CIV. A. 97–11149–PBS.

United States District Court, D. Massachusetts.

May 1, 1998.

Frederic D. Grant, Jr., Elizabeth A. Ryan, Grant & Roddy, Boston, MA, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Edelman & Combs, Chicago, IL, John Roddy, Grant & Roddy, Boston, MA, Christopher M. Lefebvre, Law Offices of Claude Lefebvre, Pawtucket, RI, for David Conley, Marie Guerriero, and Martha Cramer.

Mark S. Williams, Law Offices of Mark S. Williams, Cambridge, MA, Kevin E. Cotter.

David Pastor, Gilman & Pastor, Boston, MA, for Mary E. Boyer, Stephen Kriebel, Steven M. Beck, and Denton E. Leppo.

Frederic D. Grant, Jr., Elizabeth A. Ryan, John Roddy, Grant & Roddy, Boston, MA, for William Vazquez, William Barsotti, and Mark Gorlick.

Stephen H. Oleskey, Mark N. Polebaum, Hale & Dorr, Boston, MA, Theodore N. Mirvis, John Savarese, Wachtell, Lipton, Rosen & Katz, New York City, for Sears, Roebuck and Co.

Mark N. Polbaum, Hale & Dorr, Boston, MA, John Savarese, Watchell, Lipton, Rosen & Katz, New York City, for Western Auto Supply Co.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This petition for attorneys fees arises from the settlement of a nationwide class action against defendant Sears, Roebuck and Co. ("Sears"), challenging its practice of obtaining and collecting upon reaffirmation agreements which were not filed in Bankruptcy Court in violation of 11 U.S.C. § 524(c)(3).

The settlement results in monetary benefits of over $165 million—a recovery of 151 percent of class members' out-of-pocket losses. This common fund is to be paid to approximately 190,000 debtors, each of whom will receive additional benefits such as a finance charge waiver (at 18–21 percent credit card rates) on all post-petition purchases.

This action came in the wake of the pioneering work of the Bankruptcy Court in Massachusetts, which had denounced a variety of Sears' reaffirmation practices. *See In re Iappini*, 192 B.R. 8, 10 (Bankr.D.Mass. 1995) (Hillman, J.) (criticizing Sears for failing to comply with § 524 in the language of its reaffirmation agreements and in its practices for unrepresented debtors); *In re Hovestadt*, 193 B.R. 382, 386–87 (Bankr.D.Mass. 1996) (Feeney, J.) (reiterating that the Bankruptcy Court "has an independent obligation to review reaffirmation agreements to ensure that all the elements of § 524(c) are fully satisfied" even when the debtor is represented by an attorney); *In re Latanowich*, 207 B.R. 326, 337–38 (Bankr.D.Mass.1997) (Kenner, J.) (condemning Sears' practice of not filing reaffirmation agreements).

Class counsel seek court approval of their petition for attorneys fees in the amount of $7.5 million plus expenses of $48,237.60. Sears has stipulated to these attorneys fees, which were negotiated after the final order approving settlement had been entered. The requested attorneys fees represent approximately 4.5 percent of the common fund. The settlement agreement provides that attorneys fees shall not be taken out of the common fund. If a lodestar approach were used, the actual amount of attorneys fees of class counsel calculated by multiplying the number of hours worked by the hourly billing rate totals $826,665.00,[1] such that the requested attorneys fees would constitute a lodestar multiplier of 8.9 percent.

After hearing, and some hand-wringing, the Court concludes that the fee is not unreasonable under the common fund doctrine.

## PROCEDURAL HISTORY

This case traces back to a pro se motion of debtor Francis M. Latanowich to reopen his case on November 14, 1996. The Bankruptcy Court (Kenner, J.) had entered a discharge order in his favor on April 1, 1996, at which time no open reaffirmation agreements

---

1. The lead Boston attorneys John Roddy and Frederic B. Grant, Jr. billed at $260.00 an hour.

The lead Chicago attorneys charged $300 an hour.

were on file. At a hearing on December 17, 1996, which Sears did not attend, the debtor stated that he had entered into a reaffirmation agreement with Sears in order to keep merchandise that Sears had threatened to repossess, including a television set he wanted to keep for his children. Neither Sears nor he had filed the reaffirmation agreement. After allowing the motion to reopen, the court ordered Sears to show cause why sanctions should not be imposed on it for inviting the debtor to pay a debt that had been discharged in his Chapter 7 case.

On January 29, 1997, at the hearing on the order to show cause, Sears explained that it had not filed the reaffirmation agreement because it feared an order of civil contempt under which it would incur sanctions if it filed additional reaffirmation agreements containing certain prohibited language under the *Iappini* opinion.[2] After the hearing, the court issued two procedural orders. The first gave Sears an opportunity to submit a brief (which it filed and has since withdrawn) and gave the United States Trustee an opportunity to file a brief in support of sanctions. The second required Sears to file by February 28, 1997 a list of all unfiled reaffirmation agreements in Massachusetts from January 1, 1995 through January 29, 1997. Although the list was timely filed, the court issued a further order that it be authenticated with an affidavit.

On March 14, 1997, Sears submitted an affidavit attaching a list of approximately 2,733 bankruptcy cases in which it had obtained a post-petition "Reaffirmation Agreement"—each signed by the debtor but never filed with the Bankruptcy Court by Sears.

The *Latanowich* torch sparked a marathon to the courthouse. On March 31, 1997, the plaintiffs' counsel grabbed the torch and filed a class action in Bankruptcy Court, *Brioso v. Sears, Roebuck and Company*, Adversary Proceeding No. 97–1222–CJK, on behalf of a nationwide class of debtors asserting violations of the Bankruptcy code as well as a claim pursuant to Mass.G.L. c. 93A. This action expressly referenced the *Latanowich* proceedings. Another class action was filed on April 7, 1997, *Caldas v. Sears, Roebuck and Company*, Adversary Proceeding No. 97–1229–JNF. These two actions were later consolidated. On April 17, 1997, the government filed *United States of America v. Sears, Roebuck and Co.*, 97–10839–JLT (D.Mass.) (the "*United States* Action"), asserting not only violations of the Bankruptcy Code but also mail fraud violations pursuant to 18 U.S.C. § 1341 and 1345.[3]

The senior management of Sears and its Board of Directors maintain that they first learned that Sears had failed to file reaffirmation agreements on March 27, 1997. On April 9, 1997, Sears withdrew the memorandum of law it had filed in response to the order to show cause. In its place, it submitted a written *mea culpa* memorandum stating that "the company no longer intends to contest the court's order to show cause," and conceding that it had "exercised flawed legal judgment and execution in failing to file some reaffirmation agreements." Sears agreed to conduct an audit to identify all debtors with unfiled reaffirmation agreements from 1992 until April 1, 1997, to impose a debt collection moratorium, and to remit to such debtors all amounts paid pursuant to those unfiled reaffirmation agreements, with interest, net of

---

2. Sears was on the hot seat in Massachusetts for the year before *Latanowich*. *Iappini* had criticized Sears for: (1) including language in the reaffirmation agreement regarding the creditor's claims of nondischargeability where no such claim was made "to entice the Debtors to reaffirm an obligation;" and (2) scheduling hearings on reaffirmation agreements with no intention of appearing in support thereof by counsel. 192 B.R. at 10. Judge Hillman threatened Sears with contempt sanctions should these practices continue. *Id.* Subsequently in *Hovestadt*, Sears informed Judge Feeney that it intended "to discontinue its practice of filing reaffirmation agreements in the District of Massachusetts until the issues raised by the order to show cause are

resolved ...." 193 B.R. at 387. *See generally Sears Roebuck & Co. v. Lamirande*, 199 B.R. 221, 224 (D.Mass.1996) (Saris, J.) (requiring debtor to file statement of intention with respect to secured property and discussing role of the Bankruptcy Judge in ensuring that a consumer understands the options available). In light of these cases, Sears would have been hardpressed to argue that it was unaware that unfiled reaffirmation agreements were contrary to the law in this District.

3. Four other cases have been filed which have been consolidated here by order of the multidistrict litigation panel. *See* MDL–1185.

post-discharge purchases. It also agreed to continue to give such debtors credit availability in the amount of each debtor's unused line of credit at the time the remittance was calculated and send each a $100 gift certificate.

On April 14, 1997, the Bankruptcy Court ordered Sears to retain the services of Professor Lawrence P. King of New York University School of Law and of counsel to Wachtell, Lipton, Rosen & Katz (Sears' counsel) in order to perform a legal audit of Sears' procedures with regard to reaffirmation agreements. The court ordered Sears to adopt Professor King's recommendations and it also enjoined Sears from sending billing statements and assessing interest charges to the debtors with whom Sears had entered into reaffirmation agreements that were never filed.

On April 16, 1997, the court concluded that Sears' "disregard for the law and for the rights of the Debtor in this case was also systematic, a matter of company policy," and so held that it had the authority to issue punitive sanctions for violating a discharge order pursuant to 11 U.S.C. § 524(a)(2). *Latanowich*, 207 B.R. at 337. With respect to the individual debtor, the court awarded compensatory damages and equitable relief, but refrained from issuing an order of punitive damages "since doing so might arguably impair the government's authority to impose criminal penalties." *Id.* at 338. However, in Searing language, Judge Kenner ruled that punitive damages were warranted, stating:

> The consequential damages in this case do not begin to reflect the magnitude of Sears's offense against Mr. Latanowich and against the bankruptcy law. Sears here made a conscious decision to disregard the clear requirements of the law because it was more expeditious and profitable to do so. Its conduct toward the Debtor was predatory: Sears preyed on the Debtor when he was financially most vulnerable and powerless; and in doing so it deprived him of the fresh start that Congress intended that he should have. Sears's disregard for the plain requirements of the discharge order and of § 524(c) was contemptuous, as was its re-

sponse (in this case) to Iappini, which was simply not to file—but still enforce—an agreement that Iappini prohibited.

*Id.* at 337 (footnote omitted).

As damages, she held that the pre-petition debt of the debtor was discharged, and that he was entitled to compensation for post-petition payments of principal and interest on the pre-petition debt. She also issued an order to show cause why compensatory and punitive damages should not enter in each of the 2,733 other cases in which Sears admitted it had failed to file reaffirmation agreements. The opinion was forwarded to the United States Trustee, the United States Attorney, the Attorney General—and class counsel John Roddy, Esq.

By order dated April 16, 1997, the Bankruptcy Court, on Sears's consent, conditionally certified a temporally unlimited nationwide class, for settlement purposes only, and appointed plaintiffs' counsel as class counsel. It set June 5, 1997 as the deadline for the *Brioso* plaintiffs and Sears to report on the status of the case, with a clear direction to the parties to negotiate a fair and reasonable settlement of the claims of all class members. At some point, the Bankruptcy Court had suggested a $500 per capita sanction. A period of intensive discovery and negotiations ensued.

On April 21, 1997 Judge Tauro signed a Stipulated Order for Preliminary injunction in the *United States* Action, which required Sears to: (1) file all reaffirmation agreements; (2) conduct a national review to identify those debtors who filed Chapter 7 petitions from January 1, 1992 to the present from whom Sears had obtained signed reaffirmation agreements which were never filed; (3) cease collection activities with respect to such debtors; and (4) calculate the amounts charged and collected from these individuals, inclusive of interest, finance and other charges relating to each debtor's obligations as of the filing date of the bankruptcy petition.

On May 20, 1997, plaintiffs, concerned about the jurisdiction of a Bankruptcy Court over a nationwide class action, filed this class action complaint seeking nationwide relief for

the defendants' practice of disregarding the provisions of the Bankruptcy Code relating to the filing of reaffirmation agreements. *See* 11 U.S.C. § 524. The complaint alleged that the defendants "intended to and did withhold the existence of numerous such agreements from the Bankruptcy Court's knowledge, by not filing the agreements as required by 11 U.S.C. § 524(c)(3)." The complaint pointed out that in *Latanowich,* pursuant to court order, Sears had filed with the Bankruptcy Court a list of 2,733 debtors from whom it had obtained similar unfiled agreements. Alleging that defendants had derived substantial profits from the undisclosed "reaffirmation agreement" scheme, it also asserted causes of action pursuant to the Truth in Lending Act, 15 U.S.C. § 1601; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c); the Bankruptcy Code, 11 U.S.C. § 524(c) and § 362; Mass.G.L. c. 93A; and the equitable doctrines of restitution and unjust enrichment.

Sears threw in the towel within two weeks. The parties entered into a Stipulation and Agreement of Compromise and Settlement, dated June 5, 1997. The next day, Sears applied for a status conference and hearing before the court on a proposed class action settlement in the matter. Sitting jointly, Bankruptcy Court Judge Kenner, who was presiding over the now consolidated class action in Bankruptcy Court, and I held the settlement hearing on October 28, 1997. According to the parties, the staff of the Attorneys General of at least thirty-nine states, and the Federal Trade Commission (subject to a statutory notice and comment period) have all approved this settlement.

The settlement contains the following key terms, which also apply to Sears's subsidiary, Western Auto. First, the settlement class is defined as all debtors who owed a debt to Sears and who signed a post-petition reaffirmation agreement which either was not filed prior to the order of discharge, or if filed, was disapproved or rejected by the court or rescinded by the debtor. This class definition is significant because prior to the settlement, only debtors with reaffirmation agreements signed in 1992 were covered by the

relief ordered by the Bankruptcy Court and the Stipulated Preliminary Injunction; this sweeping settlement class effectively eliminates potential defenses that claims would be barred by the applicable statute of limitations and laches. Second, Sears shall file all reaffirmation agreements received not less than five days prior to the entry of the debtor's order of discharge. Third, Sears shall complete its ongoing national review to identify debtors from January 1, 1992 to April 1, 1997, in accordance with the stipulated order in the *United States* Action. These identified debtors will not have to file a proof of claim to recover. Fourth, Sears shall continue its ongoing billing moratorium and suspend all collection activities on each class member's account until a new balance may be calculated.

Fifth, Sears shall remit to class members all post-petition payments made on account of reaffirmed indebtedness (including all finance charges, late fee charges, returned check charges) with interest; eliminate finance charges attributable to post-petition purchases; and deem all pre-petition debt a nullity. Sixth, class members who entered into reaffirmation agreements prior to 1992 may recover by filing a Proof of Claim with sufficient documentation. Notice was sent to all Sears credit card holders as the best way to find non-identified class members (i.e. pre–1992 debtors).

Seventh, Sears shall provide a fund of $25 million to be distributed in pro rata shares to the members of the Settlement Class. Eighth, if efforts to locate an identified class member fail, the unclaimed funds will revert to the Attorney General of the class member's state for consumer education purposes. Ninth, in the event that a member of settlement class is deceased, Sears shall make the payment to such member's heirs or estate. Tenth, Sears shall continue to extend credit to the members of the settlement class, waive any security interest on goods purchased prior or to the bankruptcy filing, and attempt to correct any negative credit reports. Eleventh, "[a]s an additional benefit to the Settlement Class," Sears shall pay all attorneys' fees and expenses awarded to class counsel. (¶ 19.1.)

Both courts (Judge Kenner and I) approved the settlement, without objection by any class member, on October 28, 1997.

Subsequently, as they had informed the court they would attempt to do, counsel negotiated a settlement on attorneys fees which is at issue here. The United States Attorney, the Federal Trade Commission and the consortium of State Attorneys general were given an opportunity to comment on the requested fee award. Only the Attorney General of Massachusetts responded in a letter dated December 31, 1997. An Assistant Attorney General refuted plaintiffs' expert's position that they were faced with a "categorical denial" by Sears of the allegations and "thus faced a risky litigation against a powerful adversary." (Docket 85). Rather, citing *Latanowich,* the letter pointed out that "Sears admitted to its unlawful practices in a response to the Bankruptcy Court's Order to Show Cause, soon after the class action was filed" and noted: "We would also note that the Sears reaffirmation issue was first brought to the public attention by the actions of the bankruptcy court, prior to the filing of the class action suit."

Again, Judge Kenner and I presided jointly over the hearing concerning the reasonableness of the fees. Although the motion for approval was filed in this District Court action only, her familiarity with the background of the case was helpful. No objections were filed concerning the attorneys fees by any government or private actors—though no separate notice of the amount of the fees was sent to class members. Sears has apparently now reached consent agreements with the Federal Trade Commission, and the attorneys general of fifty states.

## DISCUSSION

■ Under the "common fund doctrine," the district court has the equitable power to reimburse a person who maintains a suit that results in the creation, preservation or increase of a fund in which others have a common interest for reasonable attorneys fees and litigation expenses incurred from that fund. *See Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 127–28, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Alyeska Pipeline*

*Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In dicta, the Supreme Court has described the doctrine as authorizing the calculation of a "reasonable fee ... based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

■ "[W]hen a fee application is submitted ancillary to, or as part of, the termination of a class action, the district court should ordinarily determine the reasonableness of the fees, notwithstanding that the source of payment does not directly impair the class recovery." *Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 522 (1st Cir.1991) (involving a class action settlement in tender offer litigation which did not result in a true common fund). The court has an obligation to serve as the "guarantor of fairness" of an attorneys fee award even when it does not come out of the common fund, when it has been negotiated by sophisticated parties, and when there are no class objectors. *Id.* at 525.

The First Circuit placed the courts in this "guardian angel" role for "fear that class actions will prove less beneficial to class members than to attorneys" in the following ways:

The problem has two aspects: extortion (that is, the prosecution of strike suits) and collusion (that is, the tension which necessarily arises between class members and class counsel when settlements and attorneys fees are negotiated simultaneously). While the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery, there is also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.

*Id.* at 524 (citations omitted).

■ In a common fund case, the district court, "in the exercise of its informed discretion, may calculate counsel fees either on a

percentage of the fund basis or by fashioning a lodestar." *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir.1995). "[T]ime logged is still relevant to the court's inquiry" even under the percentage of fund method because "time records tend to illuminate the attorneys' role in the creation of the fund". *Id.* Although pointing out the advantages of the percentage of fund approach over the lodestar approach—for example, it is less burdensome to administer, enhances attorney efficiency, and better approximates the workings of the marketplace because it is "result-oriented rather than process-oriented"—the First Circuit recognized that "it may result in the overcompensation of lawyers in situations where actions are resolved before counsel has invested significant time or resources." *Id.* (citing *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990)) (recognizing twenty-five percent as the "benchmark" award that should be given in common fund cases, though counselling use of the lodestar method rather than the POF method when "the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). In such cases, courts have the discretion to use a flexible approach in the combination of both methods. *Id.* at 308. *See generally Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 242 (1986) (discussing use of lodestar by Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) and its progeny as response to the growing concern that percentage-of-recovery systems sometimes resulted in strikingly large fee awards in some cases.)

■ Ordinarily a court approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees, using the alternative method to doublecheck the reasonableness of the fee. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 821, n. 40 (3d Cir.1995) ("For example, a court can use the lodestar method to confirm that a percentage of recovery amount does not award counsel an exorbitant

hourly rate; similarly, the percentage of recovery method can be used to assure that counsel's fee does not dwarf class recovery."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1267 and n. 3 (D.C.Cir.1993) (considering both the lodestar and the percentage of the fund as "indicia of the overall reasonableness" in calculating a fee award).

■ Although I agree with plaintiffs that the appropriate approach to use here is the common fund doctrine, the tougher issue is a determination of the appropriate percentage of the common fund in light of the fact that this case rode "piggyback" on the *Latanowich* case. *Id.* at 1272. In a similar situation, the District Court in the *Swedish Hospital* case took a "value added" approach which I found instructive. *See Swedish Hosp. Corp. v. Sullivan*, No. 89–1693, 1991 WL 319154, at *3 (D.D.C. Dec. 20, 1991). There the court had issued an earlier opinion holding that the Department of Health and Human Services (HHS) was obligated to pay the photocopying expenses of plaintiff hospitals, which had entered into agreements with peer review organizations. In a subsequent class action by all plaintiff hospitals in the Medicare Program, that same District Court concluded that class counsel had contributed about $10 million to the value of the common fund by calculating the difference between the amount per page provided by the settlement agreement and the amount proposed in an HHS regulation; accordingly, it set the percentage of the value-added fund at twenty percent. In light of the binding precedent in the Circuit in favor of the plaintiff hospitals before the class action was initiated, the Court of Appeals upheld the value added approach to calculating the reasonableness of the attorneys fees and determined that twenty percent was a reasonable percentage-of-fund. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d at 1272.

Although a majority of common fund class action fee awards fall between twenty and thirty percent, *see id.*, the expectation is that "absent unusual circumstances, the percentage will decrease as the size of the fund increases." *Report of the Third Circuit Task Force*, 108 F.R.D. at 256 and n. 63 (pointing

out that Agent Orange plaintiffs' class counsel collected over ten million dollars in fees, yet that amounted to less than 6 percent of the settlement fund). District courts have awarded fees of 4 to 16 percent as the so-called megafund baseline. *See In re Prudential Ins. Co. of American Sales Practices Litig.*, 962 F.Supp. 450, 458 (D.N.J.1997) (noting that percentage awards in megafund cases range from 4.1 percent to 17.92 percent of fund); *Duhaime v. John Hancock Mut. Life Ins.*, 989 F.Supp. 375 (1997) (O'Toole, J.) (applying 9.3 percent to a common fund over $300 million); 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 14.03 (3d ed. 1992 & Cum.Supp.1997) (noting that where fund recoveries range from $51 to $75 million, fee awards usually fall in the 13–20 percent range); 1 Alba Conte, *Attorney Fee Awards*, § 2.09, at 7 (2d ed.1993) (noting that where class recoveries have been in the $75 to 200 million range, "fee awards in the range of 6 to 10 percent are common in this large-scale context but megafund recoveries have also yielded common fund fees up to 16 percent").

Where the fund is unusually large and the application of the benchmark percentage may result in a windfall to counsel, some courts have used "a sliding scale, with the percentage decreasing as the magnitude of the fund increased, or have used the lodestar method." *Manual for Complex Litigation, Third*, § 24.12 at 189, Federal Judicial Center (1995) (citations omitted). *See, e.g., Branch v. FDIC*, Civ. Action No. 91–13270–RGS, 1998 WL 151249 (March 24, 1998) (Stearns, J.) (applying 14 percent up to $22 million; 12 percent of the next $10 million; and 5 percent of any excess over and above $32 million).

■ In the instant case, the analysis of the appropriate percentage is further complicated because the class action proceeded in tandem with federal and state law enforcement efforts. Plaintiffs' expert Charles Silver, a professor at the University of Texas School of Law, states:

> Although the available empirical evidence does not enable me to make authoritative generalizations about fee award practices in class actions where public law enforcement officials and private attorneys are working cooperatively, the anecdotal evidence known to me suggests that fees ranging from 10–15 percent of the recovery are usual in these cases.

(Silver Aff. ¶ 11).

Here, plaintiffs urge me to apply a percentage of the entire common fund of 4.5 percent. They point out that they took into account the spadework of the Bankruptcy Court as well as the actual hours expended in setting the percentage so low. I am reluctant to use the entire common fund as the basis for an attorneys fees calculation, however, as liability for compensatory damages was a foregone conclusion in Massachusetts, and a strong likelihood of success was indicated nationally. Although plaintiffs express concern about the risk of prevailing on Sears's "flagship" argument that there is no private right to enforce 11 U.S.C. § 524, the complaint asserted RICO and unfair trade practice claims as well. The stipulated order entered between the United States Attorney and Sears already signalled that Sears was virtually agreeing to full compensatory damages for any payments made on pre-petition debt, as well as accompanying finance charges, nationwide.

While Sears may be a corporate Goliath, there were fifty state attorneys general, the federal government, and the angered Bankruptcy Judges lined up across the nation with sling shots. It was only a question of which would deliver the mortal blow. While plaintiffs' counsel in this case are excellent, the extraordinary magnitude of the overall settlement is attributable in large part to this battlefield reality.

In my opinion, in these unique circumstances the better measure of success is not the size of the common fund but the value added by plaintiffs' class counsel above and beyond the amounts already on the table. The record suggests that the monetary value added to the class by the settlement was fourfold. First, Sears agreed to a damage fund of $25 million in addition to compensatory damages. Although Judge Kenner had sent a loud signal in *Latanowich* that punitives were warranted, the amount of the punitives remained to be seen; moreover, Sears was objecting to the findings in *Latanowich* that it had deliberately disregarded known law. (Grant Aff. ¶ 63, 65.) Second, as part

of the settlement, Sears agreed that the attorneys fees would not come out of the common fund. While both RICO and Chapter 93A have fee-shifting provisions, Sears could have argued that the amount of the attorneys fees should have come directly out of the fund, as is often the practice. This value added is at least $800,000. Third, Sears agreed that debtors prior to 1992 with signed but unfiled reaffirmation agreements could be compensated with appropriate documentation—an agreement which is difficult to value based on the present record. Fourth, the settlement waives all finance charges for class members' post-petition purchases, which one expert valued at $6 million in savings. (¶ 5.1.2 Aff. of Alba Conte, ¶ 6.) The court orders had only entailed eliminating finance charges for pre-petition purchases.

Based on the foregoing factors, I conclude that the value added by plaintiffs' settlement efforts was more than $32,000,000.

An attorneys fee of $7.5 million reflects between twenty and twenty-five percent of the value added by plaintiffs' counsel in this settlement. *Swedish Hospital* applied a percentage of twenty percent to the value-added portion of the fund. Unlike most of the cases cited by the plaintiffs, here the attorneys fees calculated on the lodestar approach are way out of sync with the percentage of fund approach, even when the percentage is at the lowest end of the range for megafund cases. While this is troublesome, other factors support reasonableness: (1) the negotiated agreement by Sears to the amount of fees *after* the final order approving the settlement had entered; (2) the deafening absence of any objections from any of the federal or state governmental entities; (3) the lack of any evidence suggesting collusion; (4) the fact that the attorneys fees do not come out of the fund; and (5) the non-monetary and monetary value added by class counsel.

### ORDER

I find $7.5 million in attorneys fees and $48,237.60 in expenses to be within the range of reason, and I approve them.