**In re Jimmie Edward TURNER d/b/a Jim Turner Trucking and Patricia D. Turner, Debtors.**

**Jimmie Edward TURNER d/b/a Jim Turner Trucking, and Patricia D. Turner, Plaintiffs,**

v.

**MELLON MORTGAGE COMPANY, f/k/a Meritor Mortgage, Defendant.**

Bankruptcy No. 91–0438–3P1.

Adversary No. 97–213.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

June 8, 1998.

Albert H. Mickler, Mickler & Mickler, Jacksonville, FL, for Plaintiff.

Jeffrey C. Hakanson, Echevarria, McCalla, Raymer, Barrett & Frappier, Tampa, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This Proceeding came before the Court on the Complaint of Patricia Turner (Plaintiff) against Mellon Mortgage Company (Defendant) for damages and other relief arising out of Defendant's failure to comply with the terms of Plaintiff's Confirmed Plan of Reorganization. Trial was held on March 19, 1998 and May 12, 1998. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Plaintiff, under her former married name of Sharrow, entered into a mortgage relationship with Tucker Brothers, Inc. on October 24, 1973. The mortgage provided for repayment of a principal amount of $27,500.00, together with interest at the rate of 8.5% per annum, amortized over a period of thirty years with the first payment due in December 1973 and the last payment due on the first day of November, 2003. The monthly principal and interest payments were in the amount of $211.48.

Plaintiff subsequently became divorced and acquired title to the mortgaged real property in her sole name. She continued to occupy the real property as her homestead. Ultimately, Plaintiff and her new husband were forced to file for reorganization on January 31, 1991 because of tax difficulties arising from his trucking business.

By the time Plaintiff and her husband had filed their Chapter 11 bankruptcy reorganization petition, Meritor Mortgage had become the owner of the Plaintiff's mortgage. During the course of their Chapter 11 case, Meritor Mortgage filed a secured proof of claim in the amount of $20,964.36. The Plan of Reorganization was confirmed on February 24, 1993. With respect to the secured claim of Meritor Mortgage, the Reorganization Plan provided:

Thirty days following the effective date of the Plan, the Debtors shall resume their monthly payments owed to the member of this Class. Any pre/post petition mortgage payments which were not made by the Debtors shall be added to the original loan amortization period, and the loan period shall be extended for a number of months equal to the number of pre/post petition delinquent months.

The member of this Class shall retain its security interest . . .

By confirmation, Plaintiff was delinquent by thirteen payments under the terms of the original mortgage held by Meritor Mortgage. The effect of the Confirmed Plan of Reorganization, with respect to Meritor Mortgage, was to cure the delinquency by adding thirteen payments to the end of the original loan amortization schedule. Consequently, the due date under the original loan amortization schedule was advanced by thirteen payments so that when Plaintiff began making her payments after confirmation, her payments would then be applied by the mortgage holder to the same month in which the payment would have been due. Specifically, in this situation, the due date was advanced from February 1992, with a principal balance as of that date of $18,880.20, to a new post-confirmation due date of March 1, 1993, with a principal balance (prior to the anticipated March 1, 1993 payment) of $17,825.42. Consequently, under the Confirmed Plan of Reorganization, when Plaintiff was to make her first post-confirmation payment in March 1993, it was to be applied to the amortized principal balance of $17,825.42 existing as of March 1, 1993.

Meritor Mortgage, and its successor in interest, Defendant, understood the effect of the Confirmed Plan of Reorganization on the amortization schedule. First, Meritor was represented by counsel during the reorganization. Second, after confirmation, Meritor's attorney sent a copy of the Confirmation Order to Meritor on May 10, 1993. The transmittal letter stated:

The effect of the confirmation of the Plan on Meritor's mortgage is that all delinquencies at the time of confirmation (2/4/93) are added on to the end of the loan.

Defendant received the mortgage account from Meritor in June of 1993. Thereafter, two internal memorandums, written by Defendant's employees, demonstrated that Defendant was also aware of the terms of the Reorganization Plan. Both internal memorandums acknowledged the Plan treatment of the mortgage and in particular, one memorandum stated: "There is a total of thirteen (13) payments to be added." Further, the same memorandum advised that: "This file needs to be released from bankruptcy and needs to be modified showing that 2/92 through 3/93 was placed at the end of the note." The memorandums also concurred that, "the debtor was to resume making payments effective 4/93 and there after (*sic*) which he has done."

On July 3, 1996, Defendant also received an opinion from its attorney stating that "the Plan proposed to pay the Meritor mortgage according to its terms, tacking any arrearage on to the end of the loan term." The same opinion letter acknowledged that, "Patricia Turner has been making the monthly payments $298.19 per month since confirmation of the Plan of Reorganization." However, Defendant did not follow the Confirmed Plan of Reorganization. Instead of adding the thirteen delinquent payments to the original mortgage loan amortization term as required under the Confirmed Plan of Reorganization, Defendant diverted Plaintiff's post-confirmation payments into a "suspense" fund account entitled "unapplied funds ." This diversion commenced in February of 1994, but Plaintiff was not notified that her payments were not being applied to the amortization schedule as required by the Confirmed Plan of Reorganization. Further, Plaintiff was not informed

as to any escrow advances made by Defendant.

The continued misapplication of the post-confirmation payments by Defendant had the effect of:

 (A) Causing interest to continue to accrue on the unpaid principal balance without credit for the payments made by Plaintiff during the time that those payments had been made;

 (B) Causing an excess accumulation of delinquent amounts due in the escrow account;

 (C) Causing an increased time differential between the due date and the actual payment application so that by November 1995, the account history of Defendant showed Plaintiff being due for October 1992.

As a consequence of these diversions, Defendant's attorneys ultimately wrote a letter to Plaintiff on January 26, 1996 requesting a payment of interest arrearage in the amount of $5,143.83, advanced escrow replacement in the amount of $5,586.95, and other charges of $432.51. In that letter, Plaintiff was informed that thirty-nine payments totaling $10,820.16 were required to reinstate the loan as of January 26, 1996.

Further, after Defendant began the process of placing the monthly payments in the "unapplied funds account," it started sending Plaintiff a series of proposed modification agreements. Each of these modification agreements proposed to alter the payment amounts and balances that would have been due under the Confirmed Plan of Reorganization. The proposed modifications would have had the effect of displacing the treatment of Defendant under the Confirmed Plan of Reorganization. Also, the proposed modifications would have had the effect of requiring Plaintiff to pay more money than she had been obligated to pay under the Confirmed Plan of Reorganization. Most importantly, each of the proposed modification agreements would have placed Plaintiff's mortgage in an immediate default status and vulnerable to foreclosure.

In response to these proposed modifications, Plaintiff made inquiries to Defendant.

Defendant's representatives told her that it was necessary for the modifications to be signed in order to avoid foreclosure and continued delinquency.

In an effort to clarify her situation, Plaintiff requested that her Chapter 11 attorney communicate with Defendant. Over a period of time, Plaintiff's attorney sent Defendant four letters requesting Plaintiff's loan status and history. Each of the letters advised Defendant of the effects of the Confirmed Plan of Reorganization on the mortgage amortization. Plaintiff also wrote a letter to Defendant expressing her concern as to how the payments were being applied.

Defendant did not respond to any of these letters, nor did Defendant provide a loan payment history to either Plaintiff or her attorney. Instead, Defendant continued to send the proposed modification agreements to Plaintiff. After both Plaintiff and her husband refused to sign the loan modification agreements, Defendant then proceeded to send default notices to Plaintiff. In March 1997, Defendant informed Plaintiff that her new monthly payment was $767.00. In June 1997, Plaintiff received a notice of intent to foreclose from the Department of Veterans Affairs (the mortgage guarantor). In December 1997, Plaintiff was informed that her correct monthly payment was $817.00. In its last letter, Defendant refused to accept Plaintiff's tendered regular monthly mortgage payment. Finally, in February 1998, Plaintiff was sent a mortgage payment coupon book indicating that the monthly payment was $829.00.

After confirmation of her Plan of Reorganization, Plaintiff continued to make payments to Meritor Mortgage and Defendant. As stated previously, the balance that had been due as of March 1, 1993 was $17,825.42 according to the original amortization table. Plaintiff made post-confirmation total payments equaling $16,690.10. Applying the total payments to the post-confirmation declining balance, with interest accruals at the mortgage rate of 8.5% per annum, the total principal due as of the end of December 1997, would have been $5,978.99. However, Defendant's records ultimately revealed that it had also advanced post-confirmation es-

crow disbursements in the amount of $6,266.68. Therefore, the total balance due as of December 31, 1997, according to the original amortization schedule, after giving credit to Defendant for the escrow advances, would be $12,245.67.

If Defendant had followed the Confirmed Plan of Reorganization and had allowed Plaintiff to make the payments according to the terms of the Confirmed Plan of Reorganization, the principal balance that would have been due as of July 1, 1998 would equal $10,955.48 without escrow deficiencies. However, the additional thirteen deferred payments, tacked-on to the end of the original amortization schedule, would also need to be paid.

Defendant admitted that it failed to comply with the terms of the Reorganization Plan with respect to its treatment of Plaintiff's mortgage. Throughout the entire post-confirmation period, Defendant did not apply the mortgage payments submitted by Plaintiff according to the terms of the confirmed Plan of Reorganization. Moreover, during the entire post-confirmation period, Defendant never informed Plaintiff as to the correct amount of each monthly payment required to cover principal, interest and escrow payments. In summary, Defendant continued to divert Plaintiff's monthly mortgage payments to the unapplied funds account without Plaintiff's knowledge. Even when Defendant reversed the unapplied fund deposits and applied those escrowed funds to Plaintiff's account, Defendant still was not in compliance with the Confirmed Plan of Reorganization. In November 1996, after applying the impounded funds, Plaintiff's principal balance was reflected in Defendant's mortgage account history as $16,261.37, with an additional escrow deficiency of $4,686.88. According to the original loan amortization schedule, as modified by the Confirmed Plan of Reorganization, the principal balance in November 1996 should have been $13,327.60 without any escrow deficiency. Defendant also refused to accept any further payments from Plaintiff unless she cured the claimed arrearage and paid the increased monthly payments.

As a result of Defendant's failure to comply with the terms of the Confirmed Plan of Reorganization, Plaintiff has incurred damages in an amount equal to that required to bring the loan payments current through the first day of July 1998, including required escrow payments.

Further, Plaintiff has incurred attorney's fees and costs in bringing this adversary proceeding against Defendant. Plaintiff's attorney has submitted a statement for an expenditure 58.65 hours at the rate of $150.00 per hour plus costs relevant to this adversary proceeding in the amount of $1,050.15.

## CONCLUSIONS OF LAW

■ Once a Chapter 11 Plan of Reorganization is confirmed, it is not only binding upon the Debtor but all claimants dealt with under the plan. Section 1141(a) provides:

> Except as provided in subsection (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor ... and any creditor ... whether or not the claim or interest of such creditor ... is impaired under the Plan and whether or not such creditor ... has accepted the Plan.

11 U.S.C. § 1141(a) (1998).

Further, § 524(a) of the Bankruptcy Code provides that a discharge acts as an injunction against acts of a creditor as defined in 11 U.S.C. § 524(a)(1–3). See *Hardy v. United States, Internal Revenue Service (In re Hardy)*, 97 F.3d 1384, 1388–89 (11th Cir.1996) (inherent contempt power of Court may be used to award damages based on injunction violation). "The confirmation order and discharge injunction are critical elements of the fresh start that is afforded to debtors in the Bankruptcy Code. It is essential that creditors respect these court orders and permit debtors to benefit from the rights and protections which they are entitled." *In re Thomas*, 184 B.R. 237 (Bankr.M.D.N.C.1995).

*Thomas* involved a Chapter 11 post-confirmation situation similar to that encountered by Plaintiff. In deciding whether to award attorney's fees, the *Thomas* Court looked at the different methods bankruptcy courts

have used to authorize an award of attorney's fees.

There are two separate grounds for such findings of contempt. Since § 524(a) is an injunction, some courts have applied the longstanding bankruptcy rule that willful violations of injunctions, such as the automatic stay, give rise to contempt. See *Behrens v. Woodhaven Ass'n,* 87 B.R. 971, 976 (Bankr.N.D.Ill.1988) (awarding actual damages and attorneys' fees). The more common approach, however, has been to find the party in contempt based on the bankruptcy court's authority under 11 U.S.C. § 105. *In re Barbour,* 77 B.R. 530 (Bankr.E.D.N.C.1987); (contempt power authorizes awarding damages and attorney's fees for willful violation of § 524); *In re Miller,* 81 B.R. 669 (Bankr.M.D.Fla. 1988), later proceeding, *In re Miller,* 89 B.R. 942 (Bankr.M.D.Fla.1988) (attorney who violated permanent injunction found in contempt and held liable for damages incurred by debtor); *In re Kimco Leasing, Inc.,* 144 B.R. 1001 (N.D.Ind.1992)....

■ Bankruptcy courts have properly awarded attorney's fees against a party that violates the permanent discharge injunction upon a finding of contempt. *Thomas,* 184 B.R. at 240–241, 242.

In the instant proceeding, the Complaint used the same reasoning. Count II provides as follows:

30. 11 U.S.C. § 1141(d)(1) provides that the Confirmation of a plan discharges the debtor from any debt that arose before the date of such Confirmation (except as otherwise provided). 11 U.S.C. § 524(a) provides that a discharge in a case under Title 11 operates as an injunction against acts of a creditor as defined in 11 U.S.C. § 524(a)(1–3).

33. In bringing this action for violation of the discharge injunction, Patricia Turner has incurred attorney's fees and costs in addition to the injunctive relief allowed under 11 U.S.C. § 524. Patricia Turner is entitled to entry of a temporary and/or permanent injunction under 11 U.S.C. § 105 prohibiting ...

■ Bankruptcy courts enforce discharge orders under the authority set forth in 11 U.S.C. § 105(a). Although, the Code does not provide an express remedy that is specific to the discharge, § 105(a) clearly provides the courts with the power to impose remedial sanctions and to insure prospective compliance with the discharge injunction. "By its grant of authority to take any action necessary to enforce a court order, this Court also reads [§ 105(a)] as authorizing punitive sanctions which are simply another mechanism by which the Court enforces its order.... Punitive sanctions, though imposed as punishment after the fact, nonetheless enforce court orders by their variability and the threat of their imposition for violations of such orders." *In re Latanowich,* 207 B.R. 326, 333 (Bankr.D.Mass.1997).

Under § 105, "the Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. This section of the Code has been found to authorize a bankruptcy judge to hold a party in civil contempt. *See Hardy,* 97 F.3d at 1388; *In re Walters,* 868 F.2d 665 (4th Cir.1989); *Thomas,* 184 B.R. 237 (Bankr.M.D.N.C.1995).

■ In order to be found in civil contempt, the offending party must have knowingly and willfully violated a definite and specific court order. *Thomas,* 184 B.R. at 241, quoting *In re Ryan,* 100 B.R. 411, 417 (Bankr.N.D.Ill.1989). Defendant was aware of the terms of the Confirmed Chapter 11 Plan, yet, Defendant failed to abide by its terms. Defendant's conduct is in violation of is in violation of the Court's lawful order.

Plaintiff shall obtain a credit for the post-confirmation payments made to Defendant and Meritor Mortgage in the amount of $16,690.10. Applying these payments to the post-confirmation declining balance, with interest accruals at the mortgage rate of 8.5% per annum, and repaying Defendant for its post-confirmation escrow disbursements in the amount of $6,266.68, the total balance due to Defendant as of December 31, 1997 would have been $12,245.67.

Because any post-confirmation mortgage deficiency was caused by Defendant's own actions, Plaintiff is entitled to have and re-

cover from Defendant damages in the amounts necessary to bring the mortgage account current through June 1998.

Accordingly, under 11 U.S.C. § 105, Plaintiff is granted the following remedial sanctions:

(A) The principal balance owed to Defendant by Plaintiff is established at $10,955.48 as of June 30, 1998.

(B) Defendant shall not assess any accrued interest against Plaintiff for any reason up to June 1, 1998.

(C) The escrow account for taxes, insurance and other claims by Defendant shall be deemed current through July 1, 1998, and Defendant shall only collect from Plaintiff pro-rated escrow payments for taxes and insurance and other legitimate escrow amounts for which Plaintiff becomes *prospectively* obligated under the terms of the original note and mortgage and the Confirmed Plan of Reorganization.

(D) Plaintiff may recommence her regular monthly principal and interest payment in the amount of $211.48, together with her pro-rated escrow payment (taxes and insurance) on July 1, 1998. This will be applied to payment number 296 under the original loan amortization schedule. The July post-payment principal balance due to Defendant from Plaintiff will be $10,821.60 without any interest or escrow delinquency. Further, Plaintiff shall pay Defendant the thirteen additional tack-on payments required under the Confirmed Plan of Reorganization after the original loan amortization payments have been completed on November 1, 2003.

(E) Plaintiff may recover from Defendant attorney's fees in the amount of $8,790.00, plus costs in the amount of $1,050.15, which the Court finds to be reasonable attorney's fees and costs.

A separate Judgment shall be entered in favor of Plaintiff and against Defendant consistent with these Findings of Fact and Conclusions of Law.